**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**RAY C. DAVIS, and BEHAVIORAL RECOGNITION SYSTEMS, INC., n/k/a GIANT GRAY, INC.**<br><br>          **Defendants,**<br><br>**and**<br><br>**BLACKSTONE GROUP, INC., AFCON COMMUNICATIONS, INC., and DEBRA S. DAVIS,**<br><br>        **Relief Defendants.** | **Civil Action No.**<br><br>**(Jury Trial Demanded)** |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("the Commission") alleges as follows:

<u>**SUMMARY**</u>

1. Ray C. Davis and Behavioral Recognition Systems, Inc. (now known as Giant Gray, Inc.) ("BRS") engaged in a fraudulent scheme that began as early as March 2010. As part of the scheme, the Defendants solicited over $28 million from investors in seven equity security offerings between January 2013 and July 2015 (the "Relevant Period"). To raise the funds, BRS made material misrepresentations and misleading statements to investors regarding BRS's (1) intended use of investor proceeds; (2) executive compensation; (3) related party transactions; and (4) operating expenses.

2.     Davis participated in and substantially assisted BRS's material misstatements to investors.  He was the highest-ranking executive at BRS and the executive in charge of fund raising.  Davis was also responsible for the company's offering documents, which contained multiple false and misleading statements.  He participated in drafting them, approved them, authorized their distribution to prospective investors, and personally used them to raise funds for BRS from prospective investors.

3.     Although BRS claimed in the offering documents that investor funds would be used for "growth," "mezzanine funding," "working capital," and "general corporate purposes" to build BRS's business, as Defendants raised the $28 million from investors, Davis siphoned approximately $7.8 million for his own use and benefit, engaging in a fraudulent scheme that began in at least March 2010, and continued throughout the Relevant Period.

4.     From at least March 2010, Davis used shell corporations that he controlled to divert approximately $11 million ($7.8 million during the Relevant Period) of the BRS investors' funds for his personal benefit.  To make the payments to the shell companies appear legitimate, Davis submitted, or caused to be submitted, to BRS dozens of invoices falsely claiming that these shell companies provided services to BRS.

5.     Contrary to the statements in the offering documents, Davis used the diverted investor funds for his own purposes, including:  (a) $5.2 million in transfers to Davis's and his wife's joint bank account; (b) purchases from an art gallery in Boca Raton, Florida; and (c) payments to a well-known auction house.

6.     Davis also caused BRS to send an additional $679,000 to an antiques broker to pay for Davis's personal purchases of ancient jewelry, gold, and other artifacts, including gold

pendants, gold crosses, pearl bracelets, garnet pendants, and gold rings.  To make these payments appear legitimate, Davis created a fake entity called "LS Farrow" and on at least three occasions submitted, or caused to be submitted, invoices to BRS that falsely claimed "LS Farrow" operated from Victoria, Australia and provided "financial services" to the company.  But, in reality, no such entity exists and no such services were ever provided.  In fact, the Victoria, Australia address Davis used on the invoices was really the address for a cemetery in Australia where a person named LS Farrow is interred.

7.    By engaging in the fraudulent and deceptive conduct described in this Complaint, Defendants violated and, unless enjoined, will continue to violate the following provisions of the federal securities laws:

    a.  Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and

    b.  Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.    The Commission seeks injunctive relief, disgorgement of ill-gotten gains with prejudgment interest, civil penalties, and other appropriate equitable relief from Defendants.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action under Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e), and 78aa].

10.    Defendants have, directly and indirectly, made use of the means or instruments of transportation or communication in interstate commerce, and the means or instrumentalities of

interstate commerce, or of the mails in connection with the acts, transactions, practices, and courses of business described in this Complaint.

11.     Venue is proper in this Court pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  At all times relevant to this Complaint, BRS was headquartered in Houston, Texas.  In addition, certain of the acts, transactions, practices and courses of business that form the basis for the violations alleged in the complaint occurred in this District.  Finally, Davis can be found in, and is a resident of, this District.

## DEFENDANTS

12.     **Behavioral Recognition Systems, Inc.**, now known as Giant Gray, Inc., is a Texas corporation whose principal place of business is Houston, Texas.  BRS was founded in 2005 and sold video analytic software that allows linked video cameras or other systems to recognize certain abnormal or suspicious events chosen by the user.

13.     **Ray C. Davis**, age 62, is a resident of Spring, Texas.  Davis is BRS's founder and served as its Chairman of the Board from approximately 2005 to September 2015.  Davis also served as BRS's CEO from 2005 until August 2014.  Davis and one of his sons were the only authorized signatories on BRS's bank accounts.

## RELIEF DEFENDANTS

14.     **Blackstone Group, Inc. ("Blackstone")**, is a Colorado corporation formed in 2007 and controlled by Davis since at least February 2010.  From at least February 2010, Davis served as the President and Director of Blackstone.  In February 2010, Davis also established a bank account in Blackstone's name, which Davis exclusively controlled.  From March 2010 to March 2015, Davis fraudulently caused BRS to wire approximately $6.9 million to the Blackstone

account he opened for his own personal use and benefit.  To make those payments appear legitimate, Davis submitted, or caused to be submitted, to BRS fake invoices claiming that Blackstone had provided services to BRS when, in fact, it had not.

15.   **Afcon Communications, Inc. ("Afcon")**, is a Wyoming corporation formed in February 2013, which Davis owned and controlled during the Relevant Period.  The mailing address for Afcon is the Cheyenne address of a company that has been described in at least one news article as specializing in shell company incorporation.  In January 2014, Davis established a bank account in Afcon's name, which Davis exclusively controlled.  From January 2014 to March 2015, Davis fraudulently caused BRS to wire approximately $4.2 million to the Afcon account he opened for his own personal use and benefit.  As with the payments to Blackstone, to make the payments to Afcon appear legitimate, Davis submitted, or caused to be submitted, to BRS fake invoices claiming that Afcon had provided services to BRS when, in fact, it had not.

16.   **Debra S. Davis**, age 60, is Davis's wife and resides in Spring, Texas.  From 2013 to 2016, again contrary to representations made to BRS investors in the offering documents, Davis transferred to the joint account he shares with his wife approximately $5.2 million of the funds he siphoned from BRS to Blackstone and Afcon.  Then, in October 2016, approximately $1.95 million of the diverted BRS funds was wired from the Davises' joint account to a bank account in Debra S. Davis's name only.

## FACTS

### A.   Background

17.   BRS is a software development company that marketed proprietary artificial intelligence software called "AISight" to detect suspicious behavior in video surveillance footage. According to BRS marketing materials, AISight learned from sources such as cameras, tape, and

video files how to recognize "aggressive, abnormal, and suspicious behavior." The software then generated alerts in real time for human review and action.

18.     Davis founded BRS in 2005 and served as its Chairman of the Board until September 2015; he also served as CEO from 2005 until August 2014. Davis was the highest-ranking executive at BRS and was responsible for the company's fund raising.

19.     BRS's audited financials for 2013 and 2014 reflect that the company was in dire financial condition during this period. For 2013, total sales were approximately $3.6 million, and the company had a net loss of $15.9 million. For 2014, total sales were only $765,000, and the company had a net loss of $37.7 million.

20.     Beginning in at least 2010 and continuing throughout the Relevant Period, Davis and BRS engaged in a fraudulent scheme to raise money from BRS investors and to then divert it for Davis's personal use and benefit. To execute the scheme, Defendants raised money from investors using offering documents with material misstatements and omissions. Davis then used shell companies that he controlled (Blackstone and Afcon), another fictitious entity (LS Farrow), and fake invoices to siphon millions of dollars of BRS's investors' funds for his personal benefit.

**B.      Defendants Raised Millions of Dollars from Investors Using Offering Documents That Contained Materially False and Misleading Statements**

21.     Between January 2013 and July 2015, Defendants raised approximately $28 million from investors through seven equity security offerings:

| | Equity Offering | Date of Offering | Shares Sold | Amount Raised |
|---|---|---|---|---|
| 1 | | 2/21/13 – 12/23/13 | 2.3 million shares Preferred Class B Stock | $    11,500,000 |
| 2 | 2013 Offerings | 3/12/13 – 3/31/13 | 65,000 shares Preferred Class A Stock | $         325,000 |
| 3 | | 6/4/2013 – 11/27/13 | 235,732 shares Common Stock | $         707,196 |
| 4 | | 1/10/14 – 7/21/14 | 341,000 shares Preferred Class B Stock | $      1,706,960 |
| 5 | 2014 Offerings | 6/6/14 – 1/5/15 | 3.875 million shares Common Stock | $    11,625,312 |
| 6 | | 1/12/15 – 4/22/15 | 290,200 shares Common Stock | $         870,600 |
| 7 | 2015 Offerings | 3/13/15 – 7/28/15 | 262,075 shares Preferred Class B Stock | $      1,310,375 |
| **Total Raised** | | | | **$      28,045,443** |
| **Approximate Total Misappropriated (% of Funds Raised)** | | | | **~ $7,800,000 (28%)** |

22.     To obtain the funds from prospective investors in each of these seven offerings, however, BRS made materially false and misleading statements in its offering documents concerning (1) use of proceeds; (2) executive compensation; (3) related party transactions; and (4) operating expenses.

23.     Specifically, Defendants distributed to potential investors the following offering documents containing the material misstatements and omissions:

      a.  February 1, 2013 Private Placement Memorandum ("2013 PPM")
      b.  June 1, 2012 Private Placement Memorandum ("2012 PPM") (used in the March 2013 offering)
      c.  2013 Executive Summary (Preferred)
      d.  2013 Executive Summary (Common)
      e.  2014 Executive Summary
      f.  2015 Executive Summary
      g.  2015 Power Point Presentation
      h.  January 2015 Confidential Information Memorandum ("2015 CIM")

a. **Use of Proceeds**

24.    In each of the eight offering documents identified above, BRS made material

misrepresentations and misleading statements regarding how it would use investor funds.  For

example:

a.    In the 2012 PPM and 2013 PPM, BRS stated that investor proceeds would be
used for working capital and general corporate purposes.  Similarly, in the 2015
CIM, BRS stated that investor proceeds would be used for working capital and
general corporate purposes, as well as sales and marketing and research and
product development.

BRS also stated in these three documents that "Investors will be relying on the
good faith determination made by the company's management with respect to
the allocation of the proceeds for sales and marketing, product development,
and corporate expenses."

b.    In the two 2013 Executive Summaries and one 2014 Executive Summary, BRS
stated that investor funds would be used for "Growth / Mezzanine Funding"
without any detail.

c.    BRS stated in the 2015 Executive Summary, generally, that it would use
investor funds to execute its business plan, reach better markets, and continue
product development.

d.    BRS said in the 2015 Presentation that investors' funds would be used for
"Mezzanine funding to IPO/Acquisition" and also disclosed generally that
investor funds would be used to penetrate new markets, continue product
development, and expand sales.

25.    In fact, contrary to BRS's representations that investor funds would be used for

legitimate business purposes, as described further below, Defendants diverted millions of dollars

from BRS for Davis's own use.  Of the $28 million that BRS and Davis raised from investors

between January 2013 to July 2015, Davis diverted $7.8 million – nearly 28% – for his own

personal benefit.

26.    Defendants knew, or were reckless in not knowing, that BRS's statements regarding

the intended use of proceeds in the offering documents were materially false and misleading.

Davis knew that these statements to investors were false and misleading because Davis himself diverted millions of dollars of BRS investor funds to his shell companies' bank accounts and to the antiques broker, all for his own benefit.

     **b.**  **Executive Compensation**

27.    In the 2012 PPM and 2013 PPM, which were distributed to prospective investors from January 2013 to July 2015, BRS made the materially misleading disclosure that Davis received only a nominal salary from the company.  In particular, BRS stated in both of these offering documents that:

> Effective January 1, 2010, Mr. Davis voluntarily elected to reduce his annual salary to $24,000 . . . .  Mr. Davis continues at a **total** compensation of $24,000 per year (plus medical benefits as are standard for all employees) and holds no warrants to purchase additional stock. (emphasis added.)

28.    BRS's statements were materially misleading because the offering documents did not disclose the amounts Davis received from BRS using fraudulent invoices submitted for Blackstone, Afcon, and LS Farrow.

29.    Using false invoices to make the payments appear legitimate, Davis caused BRS to pay Blackstone approximately $757,000 in 2010, $1.7 million in 2011, $1.6 million in 2012, $1.9 million in 2013, and approximately $987,000 in 2014, all of which was ultimately for Davis's own benefit.

30.    Similarly, using false invoices to make the payments appear legitimate, Davis caused BRS to pay Afcon approximately $3.2 million in 2014 and another $930,000 in 2015, all of which was ultimately for Davis's own benefit.

31.    In 2013 and 2014, Davis caused BRS to pay an antiques broker in the United Kingdom approximately $195,000 and $484,000, respectively, all of which was ultimately for Davis's own benefit.  In an effort to make at least the three payments BRS made to the

antiques broker in 2014 appear legitimate, Davis submitted, or caused to be submitted, to BRS fake LS Farrow invoices.

32.    Defendants knew, or were reckless in not knowing, that the statements regarding executive compensation in the offering documents were materially false and misleading.  Davis knew that these statements to investors were false and misleading because Davis himself diverted millions of dollars of BRS investor funds to his shell companies' bank accounts and to the UK antiques broker, all for his own benefit.

### c.    Related Party Transactions

33.    BRS made additional misleading statements in both the 2012 PPM and 2013 PPM.  Specifically, its statements in these offering documents regarding related party transactions referenced shares BRS issued to Davis as "Founders Capital," shares Davis purchased and gave to family members, and shares issued to other company executives for "services rendered."  Notably, BRS also disclosed as related party transactions payments it made to a company related to its former chief technology officer ("CTO").

34.    Although the PPMs disclosed the transactions between Davis and BRS involving company shares, BRS's statements on related party transactions were materially misleading because they did not disclose all of the material transactions "related to" Davis.

35.    Specifically, although BRS's disclosures regarding the payments to the former CTO's company indicate such payments are related party transactions, BRS did not disclose in the PPMs that by 2013 it had paid millions of dollars to Blackstone – a company controlled by, and thus related to, Davis.

36.    Defendants knew, or were reckless in not knowing, that these related party transaction statements in the offering documents were materially false and misleading.

Davis knew that these statements to investors were false and misleading because Davis himself diverted millions of dollars of BRS investor funds to his shell companies' bank accounts and to the UK antiques broker, all for his own benefit.

      **d.**    <u>**Operating Expenses**</u>

37.    In the 2012 PPM, 2013 PPM, and 2015 CIM, BRS also made materially false and misleading statements to prospective investors regarding its operating expenses for recent years.

38.    BRS's statements regarding operating expenses were materially misleading because they included as purportedly legitimate business expenses the millions of dollars Davis caused BRS to pay Blackstone, Afcon, and LS Farrow using fake invoices:

| Year | Source of Disclosure | Disclosed Operating Expenses | Misappropriated Funds | Percentage of Overstatement |
|------|---------------------|------------------------------|-----------------------|----------------------------|
| 2010 | 2012 and 2013 PPMs | $   10,636,744 | $      756,936 | 8% |
| 2011 | 2012 and 2013 PPMs | $   15,584,739 | $    1,741,688 | 13% |
| 2012 | 2013 PPM | $   15,702,917 | $    1,559,057 | 11% |
| 2014 | 2015 CIM | $   24,026,665 | $    4,702,294 | 24% |

39.    As a result, BRS gave investors the false impression that it had significantly greater operating expenses than it had actually incurred.

40.    Defendants knew, or were reckless in not knowing, that the statements regarding BRS's operating expenses in the offering documents were materially false and misleading.  Davis knew that these statements to investors were false and misleading because Davis himself diverted millions of dollars of BRS investor funds to his shell companies' bank accounts and to the UK antiques broker, all for his own benefit.

    **C.**  <u>**Davis Substantially Assisted BRS in Making Materially False and Misleading Statements to Prospective Investors**</u>

41.    As the highest-ranking executive at BRS and the executive in charge of fund

raising, Davis provided knowing and substantial assistance to BRS by participating in drafting BRS's offering documents, approving them, authorizing their distribution to prospective investors, distributing them to prospective investors, and personally using them to raise funds for BRS.

42.    Davis often reiterated BRS's misstatements when he spoke to prospective investors, legitimizing and confirming misstatements he knew to be false.

43.    Throughout the scheme, Davis spoke frequently with potential investors in order to raise funds.  During both in-person meetings and conference calls, Davis provided prospective investors with misleading information that echoed the misstatements and omissions BRS made in the offering documents.  For example:

    a.   Davis told several investors that he was taking only $24,000 from the company as his annual salary.

    b.   In response to an investor's question about how much money BRS was spending on a monthly basis, Davis said the expenses were related to the cost of going public as well as legal fees and explained that he was doing everything he could to bring the costs down.

44.    In both cases, Davis misleadingly omitted any explanation of the significant payments BRS made to Blackstone, Afcon, and LS Farrow for his benefit.

45.    Davis knew, or was reckless in not knowing, that BRS's statements to prospective investors were materially false and misleading because Davis diverted, or caused to be diverted, millions of dollars of BRS investor funds to the bank accounts of Blackstone, Afcon, and the UK antiques broker, all for Davis's own benefit.

**D.      Defendants Used Shell Companies, A Fictitious Entity, and Fake Invoices to Siphon Millions of Dollars Raised from BRS Investors**

46.    As part of the fraudulent scheme, beginning in at least 2010, Davis engaged in deceptive conduct to siphon investor funds from BRS.  Davis used shell corporations

that he controlled (Blackstone and Afcon), a fictitious entity he invented (LS Farrow), and false invoices in the names of these entities for services purportedly provided to BRS. Specifically, Davis caused BRS to send payments to bank accounts that he controlled in the names of Blackstone and Afcon as well as to pay a third-party UK antiques broker for his personal purchases of ancient and antique jewelry, gold, and other artifacts.  Davis used the fake invoices in these entities' names to make these payments appear legitimate.

### a.  **Blackstone**

47.    Davis began serving as Blackstone's Director and President in February 2010.  In February 2010, Davis also opened a bank account in Blackstone's name.  Davis was the only authorized signatory on Blackstone's bank account and one of only two authorized signatories on BRS's bank account.  Davis controlled Blackstone as well as the bank account he opened in its name.

48.    From March 2010 to March 2015, Davis caused BRS to make 133 wire transfers totaling approximately $6.9 million to the account he controlled in Blackstone's name.  Blackstone's only material source of income was the payments it received from BRS.

49.    To make the payments to Blackstone appear legitimate, Davis submitted, or caused to be submitted, fraudulent invoices to BRS.  The fictitious invoices included Blackstone's name, an email address for Blackstone, and a mailing address for Blackstone.  However, the address on the invoice was actually Blackstone's registered agent's mailing address in Colorado.

50.    The invoices indicated that Blackstone had provided BRS with "search engine optimization" services by contracting with several well-known companies.

13

However, those companies never had any relationships with Blackstone and no such services were ever provided to BRS.

51.     Davis used the funds transferred from BRS to Blackstone to fund his personal bank account and to purchase art and antiquities from a variety of vendors.  For example, Davis transferred approximately $4.6 million from Blackstone to the joint bank account he held with his wife and spent $4,000 at an art gallery in Boca Raton, Florida.

52.     Davis knew, or was reckless in not knowing, that no legitimate services were provided to BRS in exchange for the $6.9 million in payments he caused BRS to make to Blackstone and that BRS's statements in the offering documents, including investor funds would be spent on legitimate operating expenses, were therefore false and misleading.

   **b.  Afcon**

53.     During the Relevant Period, Davis was the owner, and later President and Director, of Afcon.  In January 2014, Davis opened a bank account for Afcon and was the account's only authorized signatory.  As noted, he was also one of only two authorized signatories on BRS's bank account.  Davis controlled Afcon as well as the bank account he opened in its name.

54.     From January 2014 to March 2015, Davis caused BRS to initiate 21 wire transfers to Afcon totaling approximately $4.2 million.  Afcon's only material source of income was the payments it received from BRS.

55.     To make the payments to Afcon appear legitimate, Davis submitted, or caused to be submitted, to BRS fraudulent invoices seeking payment for services that were never provided.  The invoices included general descriptions of the services Afcon

purportedly provided to BRS such as "financial consulting" and "public relations."

56.    The address on the Afcon invoices was its registered agent's mailing address in Wyoming.  A logo that appeared on the fake invoices was actually the logo for an Israeli industrial controls company with a name similar to Afcon's.  Davis had previously received an email from the Israeli company that included the logo.

57.    Davis used the money he caused BRS to transfer to Afcon for his own benefit.  For example, Davis transferred approximately $3.5 million from Afcon's account to the Davises' joint bank account and $498,000 to the Blackstone bank account that he controlled.

58.    Davis knew, or was reckless in not knowing, that no legitimate services were provided to BRS in exchange for the $4.2 million in payments he caused BRS to make to Afcon and that BRS's statements in the offering documents, including that investor funds would be spent on legitimate operating expenses, were therefore false and misleading.

### c.  **LS Farrow**

59.    Davis also created a fictitious entity named LS Farrow to cause BRS to pay an antiques broker with a similar name operating from the United Kingdom for Davis's personal purchases of ancient and antique jewelry, gold, and other artifacts.

60.    From December 2013 to November 2014, Davis caused BRS to make five wire transfers totaling approximately $679,000 to the bank account of the United Kingdom antiques broker.  Again, Davis was one of only two authorized signatories on BRS's bank accounts.

61.    To make the three wire transfers sent in 2014 appear legitimate, Davis

submitted, or caused to be submitted, to BRS fraudulent invoices purportedly from LS

Farrow.  The invoices included an address in Victoria, Australia as LS Farrow's business

address and claimed that LS Farrow provided "financial services" to BRS.

62.    The invoice address for LS Farrow, however, was actually the address of an

Australian cemetery where an individual named LS Farrow is interred.  No entity named

LS Farrow provided any financial services to BRS, nor did the UK antiques broker who

received the payments provide any financial services to the company.

63.    Rather, from October 2012 to November 2014, Davis purchased dozens of

items from the antiques broker, communicating by email with the broker regarding the

items he purchased.  These emails included:

      a.   descriptions of, among other items, earrings, silver brooches, gold coins, gold

          necklaces, and gold rings Davis purchased;

      b.   the prices Davis paid for the items; and

      c.   the bank account number for the account to which BRS sent payments.

64.    Notably, Davis caused BRS to wire the $679,000 to the same account

number provided to Davis in the emails from the antiques broker regarding payment for

Davis's personal purchases.

65.    The antiques broker also emailed Davis invoices requesting payment for the

items Davis purchased and directed Davis to send the funds to the antique broker's bank

account.  The fake LS Farrow invoices that Davis submitted, or caused to be submitted,

to BRS were bills for the exact amounts requested in the antique broker's invoices and

matched the amounts Davis caused BRS to send to the antique broker.

66.    On more than one occasion, Davis requested that the antiques broker use

16

Davis's personal email address, explaining that "its [sic] probably not appropriate to be using" his BRS email address to discuss their transactions.

67.    Payments for the items Davis purchased were almost entirely from two sources:  approximately $66,000 from Blackstone's bank account, which contained almost exclusively funds Davis siphoned from BRS; and approximately $679,000 sent directly from a BRS bank account, as described above.

68.    Davis knew, or was reckless in not knowing, that no legitimate services were provided to BRS in exchange for the $679,000 in payments he caused BRS to make to the antique broker and that BRS's statements in the offering documents, including that investor funds would be spent on legitimate operating expenses, were therefore false and misleading.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)(2)
### (Against Defendant BRS)

69.    All of the foregoing paragraphs are incorporated by reference herein.

70.    By engaging in the conduct described above, BRS, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    While engaged in the conduct described above, BRS acted at least negligently.

72.    By engaging in the conduct described above, BRS violated, and unless

restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15

U.S.C. § 77q(a)(2)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder
### (Against Defendant BRS)

73.     All of the foregoing paragraphs are incorporated by reference herein.

74.     By engaging in the conduct described above, BRS, in connection with the

purchase or sale of securities and by the use of the means or instrumentalities of interstate

commerce or of the mails, or of the facilities of a national securities exchange, directly or

indirectly, made untrue statements of a material fact or omitted to state a material fact

necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading.

75.     While engaged in the conduct described above, BRS acted knowingly or

recklessly.

76.     By engaging in the conduct described above, BRS violated, and unless

restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Against Defendant Davis)

77.     All of the foregoing paragraphs are incorporated by reference herein.

78.     By reason of the conduct described above, and as alleged in the First Claim

for Relief, BRS violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

By engaging in the conduct described above, Davis knowingly or recklessly provided

substantial assistance that aided and abetted BRS's violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

79. Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77(o)(b)], Davis is liable for those violations.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder
### (Against Defendant Davis)

80. All of the foregoing paragraphs are incorporated herein by reference.

81. By engaging in the conduct described above, and as alleged in the Second Claim for Relief, BRS violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].  By reason of the conduct described above, Davis knowingly or recklessly provided substantial assistance to and thereby aided and abetted BRS's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

82. Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] Davis is liable for those violations.

## FIFTH CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(1) and (3)
### (Against Defendants BRS and Davis)

83. All of the foregoing paragraphs are incorporated herein by reference.

84. By engaging in the conduct described above, BRS and Davis, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities.

85.    While engaged in the conduct described above, BRS and Davis acted knowingly, recklessly, or negligently.

86.    By engaging in the conduct described above, BRS and Davis violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

## SIXTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder
(Against Defendants BRS and Davis)**

87.    All of the foregoing paragraphs are incorporated by reference herein.

88.    By engaging in the conduct described above, BRS and Davis, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

89.    While engaged in the conduct described above, BRS and Davis acted knowingly or recklessly.

90.    By engaging in the conduct described above, BRS and Davis violated, and unless restrained and enjoined will continue to violate, Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SEVENTH CLAIM FOR RELIEF

**Disgorgement from Relief Defendants**
**(Against Relief Defendants Blackstone Group, Inc., Afcon Communications, Inc., and Debra Davis)**

91.   All of the foregoing paragraphs are incorporated by reference herein.

92.   As set forth in this Complaint, the Relief Defendants have received funds and assets from one or more of the Defendants, which are the proceeds of, or are traceable to the proceeds of, the unlawful activities of the Defendants as alleged above.

93.   Relief Defendants have obtained the funds and assets as part of and in furtherance of the securities violations alleged above and under the circumstances it is not just, equitable or conscionable for them to retain the funds and assets.  As a consequence, Relief Defendants Blackstone Group, Inc., Afcon Communications, Inc., and Debra Davis have been unjustly enriched.

## REQUEST FOR RELIEF

For these reasons, the Commission respectfully requests that the Court enter a final judgment:

a)   Permanently enjoining BRS and Davis from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

b)   Ordering BRS and Ray Davis to disgorge all ill-gotten gains, with prejudgment interest;

c)   Ordering Relief Defendants Blackstone Group, Inc.; Afcon Communications, Inc.; and Debra Davis to disgorge any gains or proceeds they received that are connected to the conduct described above;

d)   Ordering Ray Davis to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78uA]; and

e) Granting such other relief as the Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the Commission demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Melissa J. Armstrong
Melissa J. Armstrong
Attorney-in-Charge
Texas Bar No. 24050234
S.D. Texas Bar No. 815278

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4724
Fax: (703) 772-9292
armstrongme@sec.gov

Of Counsel:

Antonia Chion
Cheryl L. Crumpton
Gregory R. Bockin
George J. Bagnall V
Jonathan E. Carr